DEMONE ROYELIO SMITH,                              CIV. NO. 12-163 (PJS/JSM)

       Plaintiff,                              REPORT AND RECOMMENDATION

v.

J. BUCK, CITY OF BROOKLYN PARK
POLICE OFFICER,

       Defendant.


This matter is before the Court on Defendant's Amended Motion to Dismiss in Lieu of Answer [Docket No. 20].  This matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) [Docket No. 36].

## II.     PROCEDURAL HISTORY

Plaintiff Demone Royelio Smith, who is pro se, sued Brooklyn Park police officer Jason Buck under 42 U.S.C. §1983 alleging the use of excessive force during Smith's arrest.  Complaint [Docket No. 1].  In lieu of answering the Complaint, Buck moved for dismissal or summary judgment.  [Docket No. 10].  On March 28, 2012, this Court ordered Smith to respond to Buck's motion on or before May 9, 2012 and permitted Buck to file a reply memorandum.  Order, p. 1 [Docket No. 17].  The Court indicated that it would decide the motion on the parties' submissions.  Id.

On April 18, 2012, Smith moved for leave to file and serve an Amended Complaint.  [Docket No. 18].  Smith also moved for an extension of time to respond to

defendant's motion. [Docket No. 21]. On April 27, 2012, this Court granted Smith's motions and Smith filed his Amended Complaint the same day. [Docket No. 23].

Buck renewed his motion to dismiss or for summary judgment, indicating that he would rely on his previously-filed motion papers. Amended Motion to Dismiss in Lieu of an Answer [Docket No. 20].

## II.    FACTUAL BACKGROUND

### A.    <u>Smith's Version of his Arrest</u>

The facts alleged in Smith's Amended Complaint and his affidavit in opposition to Buck's motion are as follows. Smith was pulled over by Brooklyn Park police while driving on Zane Avenue in Brooklyn Park, Minnesota in the early morning of December 19, 2008. Amended Complaint, p. 2;[1] Affidavit of Demone Royelio Smith ("Smith Aff."), ¶1 [Docket No. 27]. Smith was "suspicious" of the stop, as he did not believe he had done anything wrong. Amended Complaint, p. 2; Smith Aff., ¶2. Police officer David Guderian ordered Smith out of his vehicle using his squad car's PA system. Amended Complaint, p. 2; Smith Aff., ¶4. Smith initially obeyed Guderian's commands, but once he was outside of his truck he saw other police vehicles, "panicked" and got back into his vehicle, "not to flee the scene but to call [his] family and tell them what was going on at this time." Amended Complaint, p. 2; Smith Aff., ¶5.

Smith got in and out of his car "a few times" and then obeyed Guderian's command to put his hands up and face away from Guderian. Amended Complaint, p. 2; Smith Aff., ¶¶5, 6. Smith heard a dog barking and coming up behind him. Amended

---

[1]    Smith did not number the pages of his Amended Complaint. The Court is citing to the page numbers applied electronically through ECF.

Complaint, p. 2; Smith Aff., ¶8. Smith heard Buck tell the dog to "get that guy" twice. Amended Complaint, p. 2. Smith stood still and the dog grabbed the back of his coat and began pulling Smith towards another police officer, Sergeant Steve Palmquist. Amended Complaint, p. 2; Smith Aff., ¶9. When Smith was facing Palmquist, the dog released his coat. Amended Complaint, p. 2; Smith Aff., ¶10. Palmquist pointed his gun at Smith and ordered him to turn around and get on the ground. Id. Smith obeyed, turned around and got on his knees with his hands up. Amended Complaint, p. 2; Smith Aff., ¶11. Buck then deployed the dog again without warning Smith or giving any reason for the deployment. Amended Complaint, p. 2; Smith Aff., ¶12. The dog attacked and bit Smith. Amended Complaint, p. 2; Smith Aff., ¶13. Smith alleged that he suffered two puncture wounds in the upper part of his left leg. Id. After the attack, Buck violently pushed Smith to the ground and Smith was handcuffed by other officers. Amended Complaint, p. 2; Smith Aff., ¶14. Smith was taken to the Sherburne County Jail by Drug Enforcement Agents, who informed him that there was a warrant for his arrest. Amended Complaint, pp. 2-3; Smith Aff., ¶16. While at the county jail, "health services" informed Smith that he would need stitches for his injury, which he declined based on his fear of needles. Amended Complaint, p. 3; Smith Aff., ¶16. Smith opted to be treated with antibiotics and a bandage. Id. Smith's injuries were photographed. Amended Complaint, p. 2; Smith Aff., ¶15. Smith claimed to suffer from trauma and nerve damage as a result of the dog attack. Amended Complaint, p. 3, Smith Aff., ¶17.

Smith contended that Buck used excessive force during the arrest, in violation of Smith's Fourth Amendment rights. Amended Complaint, p. 4.[2] According to Smith,

---

[2] Smith's Amended Complaint focused exclusively on Buck's use of his police dog

Buck deployed his dog twice, the first time without a "proper" warning and the second time, with no warning. Id. During both deployments, Smith was complying "for a peaceful surrender." Id. Smith further alleged that Buck violated his Fourteenth Amendment due process rights by deploying the canine and failing to give him an opportunity to surrender. Id., p. 5.[3]

Smith maintained that Buck's handling of the dog violated the Brooklyn Park Police Department's General Order 333.11 on canine deployment in an outside area, which requires that a reasonable warning be given before a dog is deployed, the warning be given over the PA system of the squad car, and the warning be read from cards provided by the police department. Id., Ex. 2 (Brooklyn Park Police Department General Order No. 331).

Smith attached to his Amended Complaint a partial copy of the police officers' Offense Report detailing his arrest. Id., Ex. 3. Smith contended that certain statements in the Offense Report were inaccurate, such as the statement that he was non-

---

and not on other incidents of his arrest.

[3]   Smith's original Complaint alleged that Buck violated Smith's Eighth Amendment right to be free from cruel and unusual punishment because Buck deployed his canine while plaintiff was handcuffed, subdued and not resisting arrest. Complaint, p. 4. This allegation has been taken out of the Amended Complaint. In addition, Smith has conceded that in an excessive force case, Fourteenth Amendment claims are analyzed under the Fourth Amendment. Plaintiff's Memorandum in Support of Response to Defendant's Motion to Dismiss in Lieu of an Answer ("Pl. Resp."), p. 3 [Docket No. 26]. Therefore, this Court will not address Smith's Fourteenth Amendment claim. See Stepnes v. Ritschel, 771 F. Supp.2d 1019, 1035 (D. Minn. 2011) ("The United States Supreme Court has held that excessive force claims involving police officers should be analyzed under the Fourth Amendment's 'reasonableness' standard rather than the "substantive due process" approach of the Fourteenth Amendment.") (citing Graham v. Connor, 490 U.S. 386, 395 (1989)).

compliant with orders and that he was not under the control of any officers when the dog was deployed for the second time.  Id., p. 4 (citing Ex. 3, p. 5).

As relief, Smith sought $157,000 in punitive damages, compensatory damages of $50,000 and an Order requiring an unnamed person or entity (presumably the Brooklyn Park Police Department) to reprimand Buck "so that this type of thing never happens again."  Amended Complaint, p. 7, Request for Relief.

## B.    Buck's Version of Smith's Arrest

Buck described a very different picture of Smith's arrest than did Smith. According to Buck, Smith was indicted for conspiracy to distribute crack and cocaine and three counts of distribution of crack on December 16, 2008, and a felony warrant was issued for his arrest.  Affidavit of Stephanie A. Angolkar ("Angolkar Aff."), Ex. 1 (Indictment) [Docket No. 13].  On December 19, 2008 at 6:46 a.m. the Brooklyn Park police executed a traffic stop of Smith at the DEA's request.  Affidavit of Dave Guderian ("Guderian Aff."), ¶¶2, 3 [Docket No. 15]; Affidavit of Sergeant Steve Palmquist ("Palmquist Aff."), ¶2 [Docket No. 16].[4]  Guderian stated that the DEA agents advised him that Smith was believed to be armed and dangerous.  Guderian Aff., ¶3.  Palmquist stated that he knew that Smith was the subject of a narcotics investigation and he

---

[4]      Smith was a member of the Detroit Boys Street Gang.  Anglokar Aff., Ex. 3 (DEA News Release dated July 2, 2011, stating "The final two defendants in a federal criminal case tied to the Detroit Boys, a street gang responsible for distributing large amounts of crack cocaine and cocaine from Minneapolis to Stevens Point, Wisconsin and from Minneapolis to St. Cloud between 2007 and the end of 2008 were sentenced on June 30 in Federal Court in St. Paul.  Judge Richard H. Kyle sentenced. . .Demone Royelio Smith, age 37, of Minneapolis, to 120 months on one count of conspiracy to distribute cocaine and cocaine base, more commonly known as crack cocaine.").  There is no indication that the officers knew of Smith's gang affiliation at the time of his arrest.

believed Smith could be armed and dangerous. Palmquist Aff., ¶¶2, 6. Buck also stated that he believed Smith could be armed and dangerous. Buck Aff., ¶5.

The DEA agents advised Guderian that they were in unmarked vehicles following Smith's truck. Guderian Aff., ¶4. Guderian pulled behind Smith and activated his squad lights. Id., ¶5. Guderian used his loud speaker to order Smith to turn off his truck and to advise him that he was under arrest. Id., ¶6. Smith complied with Guderian's initial commands to place his hands out the window, open the vehicle door, exit the vehicle, place his hands in the air, lift his coat at the waist and turn around. Id., ¶7. Guderian then ordered Smith to walk backwards toward the squad car and submit to arrest, but Smith did not do so—he got back into his truck. Id., ¶8; Amended Complaint, Ex. 3, p. 2 (Offense Report narrative by D. Guderian). At this point, Palmquist was on the scene and he directed Guderian to repeat his commands to Smith. Palmquist Aff., ¶6. Guderian repeated his commands; Smith got out of and then went back into his vehicle several times. Id., ¶9; Guderian Aff., ¶9. Guderian believed Smith was going to flee in his vehicle. Guderian Aff., ¶9. In light of what he considered a "high risk" stop, Palmquist asked for canine assistance as Smith was not cooperating and Palmquist was also concerned that Smith was going to flee. Palmquist Aff., ¶8. Buck responded with his dog partner Diesel and Palmquist helped Buck by attaching a long lead to the dog. Id., ¶9. Palmquist told Buck that if Smith exited the vehicle again, Buck should give a canine warning and immediately send the dog if Smith did not comply. Id. Smith exited the vehicle again and Buck issued a canine warning. Id., ¶10. Smith did not comply and Diesel was deployed. Id. Diesel took hold of Smith's jacket and began to pull Smith back. Id., ¶11. It appeared that Smith might take his jacket off and Diesel

lost his bite on the jacket.  Id., ¶12.  Smith was ordered to the ground but he was still not under control.  Id., ¶13; Amended Complaint, Ex. 3, p. 6 (Offense Report, D. Guderian narrative).  Diesel was redeployed and unsuccessfully attempted to apprehend Smith in the left thigh area.  Id., ¶13.  Diesel re-engaged Smith's left coat sleeve and held on, allowing Palmquist and another officer to handcuff Smith.  Id.

Smith was placed in Guderian's squad car and taken to the Brooklyn Park Police Department, where Palmquist checked Smith's injuries.  Id., ¶14.  Smith had a scratch on the upper portion of his left thigh.  Id.  Palmquist did not observe any torn skin or injuries that would require medical attention.  Id.; Amended Complaint, Ex. 3, p. 7 (Offense Report, Palmquist narrative).  The DEA agents were made aware of the injuries and were given custody of Smith after Palmquist photographed Smith's injuries.  Palmquist Aff., ¶14, Ex. 3 (color photograph of Smith's injury).  Guderian's affidavit recited essentially the same facts.  See Guderian Aff.

Buck stated that when he arrived on the scene, Palmquist told him to deploy his dog if Smith did not comply with orders.  Affidavit of Officer Jason Buck ("Buck Aff."), ¶5 [Docket No. 14]; Amended Complaint, Ex. 3, p. 7 (Offense Report, Buck narrative).  Buck had been listening on his radio and knew that Smith was exiting his vehicle and going back inside—in other words, not complying with the officers' orders.  Buck Aff., ¶4.  When Smith exited the vehicle again, Buck issued a canine warning and advised Smith that if he did not walk back towards the officers, he would deploy his dog.  Id.  Buck believed Smith was armed and dangerous and that there was a high likelihood that Smith was going to flee, "putting many innocent lives in jeopardy."  Id., ¶7; Amended Complaint, Ex. 3, p. 8 (Offense Report, Buck narrative) ("[Smith] refused to

move and stood on the outside of the truck on the driver side and continued to be noncompliant.  There was a very high likelihood that he was going to get back into the vehicle since he had done it already…and attempt to flee the scene. . . [i]t was around rush hour and there was heavy traffic in the area.")

When Diesel lost his bite on Smith's jacket, Buck re-engaged him, as Buck also observed that Smith was not under control by any officers.  Buck Aff., ¶9.  Diesel held on to Smith's coat sleeve until officers were able to handcuff him.  Id.  Buck described Smith's injury as a "skin abrasion."  Amended Complaint, Ex. 3, p. 8 (Offense Report, Buck narrative).

In support of his version of the facts, Buck submitted videos from his squad and from Guderian's squad.  Palmquist Aff., Exs. 1, 2.

## III.    STANDARD OF REVIEW

In lieu of answering the Amended Complaint, Buck moved for dismissal under Rule 12(b)(6) or, in the alternative, for summary judgment.

### A.    Conversion of Buck's Motion to Dismiss to a Motion for Summary Judgment

Buck moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative for summary judgment.  When considering a motion to dismiss, the Court "generally may not consider materials outside the pleadings, "but '[i]t may. . .consider some public records materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.'"  Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 982 (8th Cir.2008) (quoting Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999)).  Under Fed. R. Civ. P. 12(d), when "matters outside the pleadings are presented to and not excluded by the court" in connection with a Rule 12(b)(6)

motion, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).  However, the parties must be given a reasonable opportunity to present pertinent materials.  Id.  Generally, summary judgment under Fed. R. Civ. P. 56 is proper only after the non-moving party has had adequate time for discovery.  Iverson v. Johnson Gas Appliance Co., 172 F.3d 524, 530 (8th Cir. 1999) (quotation omitted).

This Court considered the Affidavits of Buck, Guderian, Palmquist[5] and Smith[6] and all of the attached exhibits in connection with Buck's Motion to Dismiss or for Summary Judgment.  Smith had notice and the opportunity to present pertinent materials in response to the motion.  Therefore, this Court converted Buck's motion to dismiss to a motion for summary judgment.

---

[5]    The Palmquist affidavit attached squad videos of the Smith's arrest, which this Court has reviewed.

[6]    The Angolkar affidavit attached only materials that are in the public domain, such as Smith's indictment, the judgment for his conviction and a press release from the Drug Enforcement Agency.  See Anglokar Aff., Exs. 1-3.  Had the Court considered only these materials, it would not have converted the motion to one for summary judgment. See Porous Media Corp. v. Pall Corp., which held:

> When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider 'some materials that are part of the public record or do not contradict the complaint,' Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir.), cert. denied, [527 U.S. 1039] (June 24, 1999), as well as materials that are 'necessarily embraced by the pleadings.'  Piper Jaffray Cos. v. National Union Fire Ins. Co., 967 F. Supp. 1146, 1152 (D. Minn. 1997).  See also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d §1357, at 199 (1990)(court may consider 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint').

186 F.3d 1077, 1079 (8th Cir. 1999).

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248). "[I]f the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted." DePugh, 880 F.Supp. at 656 (quoting Anderson, 477 U.S. at 248).

The moving party bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted).

## B.    Pro Se Pleadings

Petitioner is unrepresented.  As a result, this Court applied the traditionally liberal construction afforded to <u>pro</u> <u>se</u> pleadings.  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Federal Express Corp. v. Holowecki</u>, 552 U.S. 389, 402 (2008) (<u>pro</u> <u>se</u> litigants are held to a lesser pleading standard than represented parties.)  This Court has considered Smith's Amended Complaint and opposition to Buck's dispositive motion in light of this liberal standard, reading his papers with the "appropriate benevolence" to be afforded such pleadings.  <u>See</u> <u>Thompson v. Missouri Bd. Of Parole</u>, 929 F.2d 396, 399 n. 2 (8th Cir. 1991).

## III.    DISCUSSION

Buck argued that he was entitled to qualified immunity because his actions were objectively reasonable in light of the facts and circumstances surrounding Smith's arrest.  <u>See</u> Defendant's Memorandum in Support of Rule 12 Motion to Dismiss and, Alternatively, Summary Judgment ("Def. Mem.") [Docket No. 12], pp. 7-15.  In particular, Buck contended that the amount of force he used was reasonable in light of Smith's behavior and refusal to comply with police orders; Smith was warned twice that Diesel was going to be deployed; and Smith's minor injury was incurred while he was resisting arrest.  <u>Id.</u>, p. 14.  Moreover, even if the Court determined that his actions were unreasonable, based on the state of the law at the time of the incident, Buck asserted that any injury sustained by Smith was <u>de</u> <u>minimus</u>, and thus, he could not maintain an excessive force claim under the Fourth Amendment.  <u>Id.</u>, p. 16.

In response, Smith argued that while the squad videos showed that Buck could be heard to giving "coupled" warnings about deploying his dog, Buck did not give them

over the PA system, making it impossible for Smith to hear the warnings.  Pl. Resp., p. 3, p. 10 ("The last time I got out of my vehicle, Officer J. Buck immediately yelled an improper and unlawful coupled warning 'walk back or you're going to get bit.'").  Smith also maintained that when Diesel was re-deployed, Smith was fully under Palmquist's control and "posed no threat."  Id., p. 4; Smith Aff., ¶12.  Smith claimed that he suffered an "actual injury" during his arrest.  Id., p. 1; Smith Aff., ¶17.

In reply, Buck contended that the squad videos clearly showed that Buck warned Smith that he was going to deploy Diesel, notwithstanding Smith's assertion that he did not hear the warnings.  Defendant's Reply Memorandum in Support of Rule 12 Motion to Dismiss and Alternatively, Summary Judgment ("Def. Reply"), p. 1 [Docket No. 31].  Buck further disputed Smith's contention that at the time Diesel took hold of Smith's thigh, he was fully subdued and in the officers' control.  Id., pp. 2-3.  Buck reiterated that Smith was considered armed and dangerous and, even though Smith may have intended to surrender by getting on his knees, until Smith was handcuffed, he could not be considered to be in the officers' control.  Id., p. 3.  Therefore, Buck's use of Diesel was reasonable and no constitutional violation occurred.  Id.  Furthermore, Smith's injury was so de minimus that it could not be considered an "actual injury" for the purposes of a Fourth Amendment violation.  Id., pp. 3-4.

"'Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The doctrine 'gives ample room for mistaken

judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996) (quoting Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995)). "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Davis v. Scherer, 468 U.S. 183, 195 (1984)). "The obvious function of the qualified immunity rule is to excuse an officer who makes a reasonable mistake in the exercise of his official duties." Edwards v. Baer, 863 F.2d 606, 607 (8th Cir. 1988).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)). "The lynchpin of qualified immunity is the public official's objective reasonableness." Bagby, 98 F.3d at 1098 (emphasis in original).

"[T]o withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted).

The Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001) described a sequence for analysis for qualified immunity cases under which the court initially decides whether the facts as alleged show that the officers' conduct violated a

constitutional right.  Pursuant to <u>Saucier</u>, if the facts do not show a violation, the court does not proceed further with the qualified immunity analysis.  <u>Id.</u>  The Supreme Court later receded from the sequential analysis mandated by <u>Saucier</u> and clarified that the "<u>Saucier</u> procedure should not be regarded as an inflexible requirement" although the Court "continue[d] to recognize that it is often beneficial."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).  The Court acknowledged that "in some cases, a discussion of why the relevant facts do not violate a clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all."  <u>Id.</u>

In a qualified immunity case, the general summary judgment standard does not dictate that "the court should . . .deny summary judgment any time a material issue of fact remains on the [constitutional violation] claim [because to do so] could undermine the goal of qualified immunity."  <u>Brockinton v. City of Sherwood, Ark.</u>, 503 F.3d 667, 671 (8th Cir. 2007) (quoting <u>O'Neil v. City of Iowa City, Iowa</u>, 496 F.3d 915, 917, 2007 WL 2279043 at *2 (8th Cir. 2007) (quoting <u>Saucier</u>, 533 U.S. at 202)).  Rather, the Court must "take a careful look at the record" and determine "which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so blatantly contradicted by the record ... that no reasonable jury could believe [them]."  <u>O'Neil</u>, 496 F.3d at 917; <u>accord</u>, <u>e.g.</u>, <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) ("[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In other words, a plaintiff alleging constitutional violation may not merely point to "unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor without resort to speculation, conjecture, or fantasy." Reed v. City of St. Charles, Mo., 561 F.3d 788, 790–91 (8th Cir. 2009) (affirming district court's grant of summary judgment to city officials and police officer defendants on plaintiff's excessive for claims, noting that nothing in the record supported plaintiff's assertion that he was passively awaiting arrest when he was struck with a baton by police officers).

A claim of excessive force also requires a plaintiff to show that he has suffered an actual injury, which is more than de minimus. See Grady v. Becker, Civ. No. 11-686 (RJK/JSM), 2012 WL 5494921 at *6-7 (D. Minn. Nov. 13, 2012).[7] Generally, a plaintiff

---

[7]    Grady provides a detailed analysis of the "actual injury" inquiry in excessive force cases before and after the Eighth Circuit's decision in Chambers v. Pennycook, 641 F.3d 898, 904 (8th Cir. 2011). Before Chambers, different Eighth Circuit panels had reached different conclusions regarding the degree of injury needed to sustain a claim of excessive force. For example, in Lambert v. City of Dumas, 187 F.3d 931, 936 (8th Cir. 1999) the court concluded that a plaintiff could assert an excessive force claim provided he sustained some injury, however minor. On the other hand, in Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005), the court determined that de minimus injury was insufficient to support a finding of a constitutional violation. Chambers clarified that the degree of injury is not dispositive of an excessive force claim—rather, the focus must be on the amount of force used, not the resulting injury. 641 F.3d at 906. The court explained:

> The degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted. Some plaintiffs will be thicker skinned than others, and the same application of force will have different effects on different people. A greater than de minimus injury requirement under the Fourth Amendment would mean that the same quantum of force, in the same circumstances, could be unconstitutional when applied to a citizen with a latent weakness and constitutional when applied to a hardier person.

alleges sufficient injury under this standard where "there is some long-term or permanent injury, or at least some medical evidence to support plaintiff's claim of injury." LaCross v. City of Duluth, Civ. No. 10-3922 (JNE/LIB), 2012 WL 1694611 at *11 (D. Minn. May 14, 2012) (citing Cook v. City of Bella Villa, 582 F.3d 840 (8th Cir. 2009) (use of a Taser reasonable where the plaintiff did not allege any permanent neck or back problems)); see also Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006) ("relatively minor scrapes and bruises" and a "less-than-permanent aggravation of a prior shoulder condition" are de minimis injuries); Andrews, 417 F.3d at 818 (finding injuries were de minimis where they were "at most very minor injuries, likely nothing more than the temporary and slight aggravation of pre-existing conditions"); Crumley v.

---

Id. The Chambers court then found that the police officers, who were accused of use of excessive force, but who had caused a de minimus back contusion, were entitled to qualified immunity as a matter of law because their actions in 2005 predated the Eighth Circuit's decision rendered on June 6, 2011.

The courts in this jurisdiction look to prevailing law on the date of the alleged injury to decide whether the pre-Chambers standard of "more than de minimus injury" applies. As the court explained in Grady, the law prevailing in October, 2010, described injuries such as the abrasions plaintiff suffered during arrest as de minimus as a matter of law. 2012 WL at *7 (citing Chambers, 641 F.3d at 906) ("'relatively minor scrapes and bruises and a "less than permanent aggravation of a prior shoulder condition" are to be considered de minimus injuries.'") (quoting Wertish v. Krueger, 433 F.3d 1060, 1067 (8th Cir. 2006); see also Peterson v. Kopp, Civ. No. 11-2578 (RJK/FLN), 2012 WL 4872668 at *4-5 (D. Minn. Oct. 15, 2012) (noting that at the time of plaintiff's arrest in April, 2011, "it was not clearly established. . .that an officer violated the rights of an arrestee by applying excessive force that caused only de minimus injuries" and finding that as a matter of law temporary pain, a burning sensation in plaintiff's face and peeling skin on his eyelid were de minimus injuries) (quotation omitted); LaCross v. City of Duluth, Civ. No. 10-3922 (JNE/LIB), 2012 WL 1694611 at *10 (D. Minn. May 14, 2012) (applying pre-Chambers standard to conduct that occurred in 2006).

Because the conduct complained in the instant case occurred on December 19, 2008, this Court applies the pre-Chambers standard to Smith's claims.

City of St. Paul, Minn., 324 F.3d 1003 (8th Cir.2003) (finding no excessive force where the plaintiff did not "present any medical records indicating she suffered from any long-term or permanent physical injury"); Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1081 (8th Cir.1990) (plaintiff's claim of excessive force failed where he presented no medical records indicating he suffered any long-term injury).

With these standards of review in mind, the Court now turns to Buck's motion for summary judgment.

### A.     Buck's Deployment of Diesel was Objectively Reasonable

This Court's initial inquiry focuses on the facts and circumstances surrounding Smith's arrest.

The use of force is excessive under the Fourth Amendment if it is not "objectively reasonable under the particular circumstances." Grenier v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994). Whether a police officer used constitutionally excessive force is analyzed under the "reasonableness" standard established in Graham v. Connor, 490 U.S. 386, 392 (1989). Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006) (Fourth Amendment excessive force claims are analyzed under the reasonableness standard of Graham); Kuha v. City of Minneapolis, 365 F.3d 590, 598 (8th Cir. 2003) (same), (abrogated on other grounds by Szabla v. City of Brooklyn Park, 486 F.3d 385 (8th Cir.2007) (en banc)). "Determining whether the force used. . . is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake. Samuelson, 455 F.3d at 875 (citing Graham, 490 U.S. at 396). "The right to make an arrest or investigatory stop

necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. (citations omitted). "To determine if the officers used excessive force, we pay 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. at 876 (quoting Graham, 490 U.S. at 396).

"Reasonableness is determined from the perspective of 'reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Id. (citing Graham, 490 U.S. at 396). Further, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (quoting Graham, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-397.

"Review of excessive force claims involving police dogs is properly governed by the general [reasonableness] standard established in Graham." Kuha, 365 F.3d at 598. Because the reasonableness of a police officer's actions depends on the totality of the circumstances, there is "no per se rule that deployment of a police dog must be preceded by a warning." Grady, 2012 WL 5494921 at *4 (citations omitted). That said, "the presence or absence of a warning is a critical factor in virtually every excessive force case involving a police dog." Kuha, 365 F.3d at 599.

After considering the record as a whole,[8] including a review of the police squad videos, this Court concludes that Buck is entitled to summary judgment on Smith's excessive force claim. To begin with, Smith's version of his arrest omits material, undisputed facts: Smith was wanted on a felony warrant; he was considered armed and dangerous; he disregarded the officers' commands not once or twice, but over and over; and his arrest took place on a busy public street at rush hour and in the early morning darkness. Palmquist Aff., Ex. 1 (Guderian Video #35493). Further, although Smith recites as "fact" the notion that he disobeyed police orders because he went back into his truck to call his family, that "fact," even if true, was unknown to the officers.

Guderian's squad video depicts an extremely tense confrontation between Smith and Brooklyn Park police officers. Id. The stop was made on southbound Zane Avenue at 6:46 a.m. on a dark December morning at the beginning of morning rush hour traffic. Heavy traffic, including school busses, can be observed passing Smith's truck and the officers. Id. Guderian is heard over his squad PA informing Smith that he is under arrest and that he should place his hands out of the car window. Smith initially obeyed, but as soon as he exited his vehicle, he became non-compliant—Guderian ordered Smith to walk backwards towards Guderian's squad car, but Smith instead got back into his truck. Id. Guderian then ordered Smith repeatedly to put his hands out of the

---

8    When reviewing the record, the Court was mindful that excessive force claims must be analyzed by from the perspective of "'reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Samuelson, 455 F.3d at 896 (citing Graham, 490 U.S. at 396). Further, the Court was not obligated to accept Smith's or Buck's version of the facts to the extent that their versions were unsupported or contradicted by the record. See Reed, 561 F.3d at 790 (evidence submitted by officers, including their contemporaneous accounts, and medical records did not support plaintiff's allegations of excessive force—the only "evidence" of excessive force was plaintiff's own recounting of the events surrounding his arrest).

window, which Smith refused to do. Id. Smith got out of the truck again and was ordered to step back to the squad car. Id. Instead of complying with that order, Smith got back into the truck for a second time and again refused orders to put his hands out of the window. Id. At that point, the officers clearly believed that Smith was going to flee—someone can be heard to say "who's ready to chase?" and "someone be ready to drive." Id. Smith was again ordered to place his hands out of the window, which he refused to do. Id. Traffic can be seen stopped directly opposite Smith's truck. Id. Smith exited his truck again and was ordered to walk towards the officer's voice. Id. Smith refused and got back into his truck. Id. Guderian then ordered Smith, at least seven times, to step out of the truck with his hands in the air. Smith eventually got out of the truck, but would not face away from the officers, as he was ordered to do. Id.

Buck's squad video shows that at the point of Buck's arrival on the scene, traffic had been re-routed on Zane Avenue and a school bus is waiting directly behind one of the squad cars. Palmquist Aff., Ex. 2 (video from Buck's squad). Buck can be seen placing Diesel on a long leash and yelling out to Smith, twice, "walk away or you'll get bit." Id. When Smith continued to stand by the side of his truck, Diesel was released on the long leash and began pulling Smith backward by his jacket. Id. Diesel lost his grip on Smith's jacket and Smith is seen turning towards the officers. Id. Smith got on the ground, and Diesel is observed near Smith—presumably this is the point at which Diesel attempted to grab Smith's thigh. Id. Smith was then subdued and handcuffed. Id.

In all, the squad videos depict a standoff between the police and Smith in a heavily trafficked public area. Smith's assertion that he was "panicked" and only went

back into his truck to make a phone call is not only unsupported by any evidence, it is irrelevant to the Court's analysis of the reasonableness of Buck's actions. From the perspective of a reasonable police officer in similar circumstances, at best Smith was observed disregarding the officers' orders and at worst, there was a possibility that Smith was retrieving a weapon.[9] To characterize the circumstances under which Buck deployed Diesel as "exigent" would be an understatement.

Furthermore, the video does not support Smith's assertion that he was fully under the officers' control when Diesel grabbed his thigh. Smith stated that Palmquist "seeing that he was now in control, cause [sic] I no longer posed a threat, holstered his gun and got out his handcuffs to handcuff me." Smith Aff., ¶11. This self-serving statement is contradicted by the video. Buck's squad video shows Smith getting to the ground, but he had not yet been handcuffed nor had the officers had the chance to pat him down for weapons. As far as the officers knew, Smith was armed and could easily have reached for a weapon up until the time he was handcuffed. Moreover, although Palmquist may have holstered his weapon, numerous other police officers were present, with their guns drawn, waiting for Smith to be handcuffed. As another court confronted with similar facts reasoned:

> Assuming that [plaintiff] intended to surrender. . .and that he made his intent known by laying face down on the ground with his hands behind his back, that does not mean that he was subdued and that the police were required to immediately cease all use of force. The situation the police confronted was dynamic and dangerous. They had good reason to believe that [plaintiff]. . .was armed and dangerous. [Plaintiff] had demonstrated that he had no

---

[9]     The Guderian video shows officers with their guns drawn cautiously approaching the truck after Smith had been subdued, suggesting concern for something going on in the vehicle. Palmquist Aff., Ex. 1.

> respect for their lawful authority, as evidenced by the car
> chase he led them on only moments earlier. The police
> were entitled to use reasonable force to protect themselves
> and others until the point at which [plaintiff] was in handcuffs.

Holloway v. Lott, Civ. No. 08-821, 2011 WL 445089 at *6 (E. D. Ark. Feb. 3, 2011).

As to Smith's claim that Buck did not warn him that he was going to deploy Diesel, the warnings can be heard plainly on both the Buck and Guderian videos. Further, an excessive force claim in connection with the use of police dogs cannot turn on a plaintiff's assertion that he did not hear a warning, when there is objective proof that a warning was giving. As Buck correctly argued, the objectively reasonable determination does not turn on whether the claimant heard the warning; the focus is on whether the appropriate warnings were given. Def. Reply, p. 2.

As for Smith's contention that even if Buck warned him once, Buck should have warned him again before Buck deployed Diesel after Diesel lost his grip on Smith's jacket, the Court finds Smith's effort to parse the encounter into two separate incidents, each requiring a separate warning to be constitutionally valid, is not supported by the record. The videos depict a chaotic environment in which Smith, who was presumed to be armed and dangerous, was being pulled backwards by Diesel, Diesel lost his grip, Smith turned towards the officer and began to get onto the ground, and Diesel attempted to grip him by the thigh. No second warning was required for Buck's use of Diesel to meet Fourth Amendment standards. As a matter of law, this Court concludes that Buck's use of Diesel was constitutionally sound.

The Court also rejects Smith's argument that Buck's failure to give the warning in compliance with the Brooklyn Park Police Department's General Order 331.11, resulted in a constitutional violation. Buck submitted a copy of Order 331 in effect at the time of

Smith's arrest.  <u>See</u> Affidavit of Deputy Chief Craig Enevoldsen, Ex. 1 [Docket No. 32].

Section 331.11 sets out the general procedures for the deployment of a police dog for a search of a subject in a building, an outdoor area or a track, and then describes the language of the warnings, which state that the subject should surrender or the dog would be sent to find him or her.  This written policy has no bearing on Buck's actions. The situation did not involve an outdoor search for a subject.  Police were not searching for Smith nor was Diesel used to find Smith.  Rather, Diesel was used to subdue Smith.

**B.     <u>Smith's Injury was De Minimus</u>**

Finally, the Court finds that any injury that Smith sustained from the dog bite were <u>de minimus</u>.  There is no evidence to support Smith's claim that he suffered a puncture wound requiring stitches, (which he declined because he is afraid of needles), nerve damage consisting of "periodic pain" at the bite site, and permanent scarring. Amended Complaint, p. 3; Pl. Response, p. 5; Smith Aff., ¶17.  But even accepting as true Smith's allegation that he suffered a "puncture wound" and not an abrasion or "scratch" as describe by Buck, (<u>see</u> Guderian Aff., ¶17; Palmquist Aff., ¶14, Ex. 3 (color photograph of Smith's injuries); Amended Complaint, Ex. 3, p. 4 (Offense Report, Palmquist narrative), p. 5 (Buck narrative)), the fact that the wound was treated only with antibiotics and a bandage indicates that it was a <u>de minimus</u> injury, rendering it no different from an abrasion.  <u>Cf.</u>  <u>Roy v. Regas</u>, Civ. No. 11-1258 (DWF/LIB), 2013 WL 50451 at *4 (D. Minn. Jan. 3, 2013) (chin laceration requiring six stiches to close, which medical records described as a "major laceration" was not <u>de minimus</u> as a matter of law); <u>see also</u> <u>Grady</u>, 2012 WL 5494921 at *6 (facial abrasions are a <u>de minimus</u> injury);

Binion v. City of St. Paul, 788 F. Supp.2d 935, 945 (D. Minn. Mar. 9, 2011) (sore arm and small bruises are de minimus)..

Further, apart from Smith's unsupported statements regarding the extent of his injuries, there is no evidence to support his claim that the attack traumatized him so much that he no longer loves dogs and is fearful to be around dogs for fear that they will attack him "for no reason at all." Amended Complaint, p. 2; Pl. Resp., p. 5. Even accepting that Smith is now afraid of dogs, that is not the sort of injury that can sustain a Fourth Amendment claim. See Kopp, 2012 WL 4872668 at * 5 (plaintiff's feeling of being "on edge," for which he did not seek treatment, not sufficient to state a Fourth Amendment claim). Cf. Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009) (genuine issues of material fact regarding use of excessive force by police precluded summary judgment where plaintiff alleged she was traumatized by use of Taser and manner of her arrest and where there was evidence that she visited her primary care physician who prescribed anti-anxiety medication, that she visited a psychologist twice, and had problems sleeping).

In summary, Smith's excessive force claim fails as a matter of law because he has not demonstrated that he suffered an actual injury as a result of Buck's deployment of Diesel—an essential element to his claim. See Andrews, 417 F.3d at 818 (excessive force claim cannot be sustained where plaintiff suffered only de minimus injury); Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005) ("an actual injury must be shown to support an excessive force claim under the Fourth Amendment.").

## V.    CONCLUSION

This Court concludes that Buck is entitled to qualified immunity as a matter of law.  First, Buck's use of Diesel was objectively reasonable in light of the circumstances prevailing at the time of Smith's arrest.  A reasonable officer in Buck's position would have had every reason to fear that Smith, who was believed to be armed and dangerous, posed a significant threat to the officers' safety and the safety of the public if he was not subdued as quickly as possible.  Buck warned Smith before deploying his dog—warnings that can be heard clearly on the Buck and Guderian squad videos.  Whether Buck did or did not issue a second warning before Diesel bit Smith's thigh is not relevant to this Court's decision to grant Buck summary judgment.  Therefore, even assuming that Smith was surprised when Diesel grabbed his thigh and believed that he was owed another warning, Buck did not violate Smith's constitutional rights by failing to issue another warning.

Second, applying the operative law when this incident occurred, Buck is entitled to summary judgment because the injury sustained by Smith was <u>de minimus.</u>

## VI.    RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

Defendant's Motion Defendant's Amended Motion to Dismiss in Lieu of Answer [Docket No. 20] be GRANTED and Plaintiff's lawsuit be dismissed with prejudice.


Dated: January 23, 2013                      *Janie S. Mayeron*
                                             JANIE S. MAYERON
                                             United States Magistrate Judge

**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 6, 2013** a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under this Rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.